IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| JOSHUA ADAM HUBBARD, <br><br> Plaintiff, <br><br> vs. <br><br> COMMISSIONER OF SOCIAL SECURITY,[1] <br><br> Defendant. | 4:21CV3015 <br><br><br> **MEMORANDUM AND ORDER** |

This is an action for judicial review of a final decision of the Commissioner of the Social Security Administration ("Commissioner"). The plaintiff, Joshua Adam Hubbard appeals a final determination of the Commissioner denying his application for disability benefits, Filing No. 29 (Plaintiff's Motion to Reverse) and Filing No. 30 (Defendant's Motion to Affirm). This Court has jurisdiction under 42 U.S.C. § 405(g).

## I.   BACKGROUND

Joshua A. Hubbard ("plaintiff") filed an application for Title II Disability Insurance Benefits, alleging he suffered from a disability that began on June 1, 2016, due to posttraumatic stress disorder ("PTSD"), social anxiety, and chronic hip, back, shoulder, and wrist pain. Filing No. 23, Administrative Transcript ("Tr."), Filing No. 23-1, at 10, 165, 182. His application was initially denied and on reconsideration, he was granted a telephonic hearing before an Administrative Law Judge ("ALJ"). *Id.* at 93, 98. After the hearing on July 10, 2020, the ALJ issued an unfavorable decision. *Id.*, Filing No. 23-2, Tr. at 10-24. The Appeals Council denied review, making the ALJ's decision the final Agency decision. Filing No. 23-1, Tr. at 1. Jurisdiction is based on 42 U.S.C. § 405(g).

---

[1] Kilolo Kijakazi, Acting Commissioner of the Social Security Administration, is substituted for the Commissioner of Social Security.

1

Hubbard was born in 1984 and was 32 years old at the time of disability onset. He has past relevant work as a short order cook; a flight engineer; cook; and a chef. Hubbard served in the Navy from 2013 to 2015. Filing No. 23-8, Tr. at 395. While in the service, he injured his left hip and lower back. *Id.* at Tr. 395, 400. He underwent left hip labrum repair, which was apparently unsuccessful, in December 2014. He has complained of ongoing pain and limited range of motion since then. Filing No. 23-3, Tr. at 63. He later underwent shoulder surgery and carpal tunnel surgery.

A.   Hearing Testimony

At the hearing, Hubbard testified that he is only able to do short spurts of driving without having significant hip and back pain. Filing No. 23-2, at 32. He stated his wife does all of the errands and grocery shopping. *Id.* He testified he is not able to go to the gym and work out. *Id.* He also testified that at his last attempt at employment, he got into a fighting and screaming match with his boss. *Id.* at 44. He stated that he could not handle another job because the anxiety was too much. *Id.* at 44, 46. He stated that pain in his left hip, lower back, left shoulder, and left wrist, and his anxiety and depression prevent him from working. *Id.* at 46. He stated that sitting, standing, walking, and picking things up make the pain worse. *Id.* at 47. He takes Duloxetine, Diclofenac, Pregabalin and Lyrica for pain and buspirone for anxiety. *Id.* He also stated he "just can't stand being around people" and "despises [being around people]." *Id.* at 50. He testified he is constantly paranoid and does not do well interacting with people. *Id.* Further, he stated that the surgeries on his shoulder and wrist did not help, and he can hardly use his left hand. *Id.* at 52. He testified that on bad days, he can barely function. *Id.* He stated he can stand for only 5 minutes and sit for only 15 minutes. *Id.*

A vocational expert also testified at the hearing. She was asked to assume a hypothetical individual with

> the residual functional capacity to perform work at the light exertional level. He can occasionally climb ladders, and frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. He can occasionally push and pull with the left upper extremity; can frequently reach, handle, finger, and feel with the left upper extremity. He can tolerate occasional exposure to extreme cold, vibration, and hazards, such as high exposed places and moving mechanical parts. And can perform simple and routine work tasks, sustained concentration and persist at work tasks for two hours at a time with normal breaks in an eight-hour workday; perform work with few changes in the work routine; and occasionally interact with coworkers, supervisors, and members of the general public.

*Id.* at 56. She was asked whether there were jobs in the national economy that such an individual could perform. *Id.* She responded that such an individual could perform jobs such as a cleaner, housekeeper, routing clerk, or mail clerk. *Id.* However, she stated that if the individual had the residual functional capacity to perform only sedentary work, and was limited too occasional reaching, handling, fingering, and feeling, there would be no jobs that the individual could perform. *Id.* She also stated that there would be no jobs if a person were expected to miss four days of work a month on a consistent basis. *Id.*

  B. Medical Evidence

Medical records show that in the Fall of 2016, Hubbard reported leg and hip pain. Filing No. 23-8, Tr. at 467. An examination showed Hubbard had pain with left hip range of motion testing, left knee pain with range of motion testing, abnormal sensation, and pain with McMurray's testing. *Id.* at 467-68. An EMG of Hubbard's lower extremities showed chronic left L3-L5 radiculopathies and sensory symptoms are consistent with meralgia paresthetica. *Id.* at 469. Hubbard was diagnosed with L lower extremity radiculopathy, sciatic nerve, and had moderate left lower extremity

paresthesias and/or dysethesias and numbness. Filing No. 23-9, Tr. at 588. A sensory exam showed decreased sensation in his left lower leg and ankle (L4/L5/S1) and he had moderate incomplete paralysis antalgic gait secondary to his SC L hip. Id. at 589–90. He was diagnosed as having a peripheral nerve condition or peripheral neuropathy and L lower extremity radiculopathy, sciactic nerve, moderate. Filing No. 23-9, Tr. at 587–88.

He was seen by Richard Whittier, M.D., for a pain consult at the VA on November 18, 2016, for his low back and lower extremity pain. Filing No. 23-8, Tr. at 453. An examination at that time revealed that the plaintiff was lying on the exam table with his left leg elevated, ambulated with a limp, was holding onto furniture whenever it was readily available, and was unable to walk on his heels. Id. at 455. He had reduced range of motion, and "strongly positive" straight leg raise testing on the left, eliciting left sciatica. Id. Dr. Whittier referred the plaintiff to physical therapy. Id. at 456. On July 17, 2017, Hubbard reported, at a pre-operative evaluation prior to implantation of a spinal cord stimulator, that his pain had gotten worse over time. Id. at 426–28.

On August 30, 2017, Hubbard was again treated for his back and left hip/lower extremity pain. Id. at 424. He reported his left hip and lower extremity pain had been unresponsive to surgery and multiple interventions. Id. He further related he used a cane at times, could sit for ten minutes, and could stand for five minutes. Id. An examination showed Hubbard had diffuse tenderness to palpation over the left anterior thigh, diffuse swelling in this region, and diminished sensation in the left anterior thigh. Id. at 425. Hubbard was referred for an MRI of his left hip and advised to obtain

treatment for his mental impairments prior to undergoing the spinal cord stimulator. *Id.* at 425–26.

On January 16, 2018, and again on September 5, 2018, Hubbard had a pulsed radiofrequency ablation procedure of L1 and L2 on the left. *Id.* at 489–90. On March 4, 2019, Hubbard reported to Jeanene Miller at the VA that the lumbar pain he experienced every day was at a level of seven out of ten in severity. *Id.* at 387. At that time, Hubbard was unable to undergo the scheduled radiofrequency ablation procedure because the correct electrode could not be located. *Id.* at 388.

Hubbard was also treated for pain in his left shoulder. Filing No. 23-7 at 304–15. He received physical therapy for his left shoulder pain beginning in May 2019 and returned though June 17, 2019. *Id.* at 267. He reported the shoulder injury was due to multiple falls due to hip instability. Filing No. 23-3 at 63. In May 2019, Plaintiff underwent an EMG of his upper extremities due to his tingling and pain. Filing No. 23-7 at 250. That study showed electro-diagnostic evidence of left mild median nerve mono-neuropathy. *Id.* at 250. He was provided with a wrist brace. *Id.* at 249. An examination on May 29, 2019, demonstrated that Hubbard had abnormal posture, global tenderness to palpation of the neck and left shoulder with more tenderness at the long-head biceps; reduced range of motion; reduced strength; and positive Hawkins, empty can, Neer, and Speed's testing on the left. *Id.* at 274. An examination showed Hubbard had limited range of motion of his left shoulder, tenderness to palpation, and reduced strength in the left hand. *Id.* at 305. Hubbard was then referred to neurosurgery for his left wrist carpal tunnel and advised to undergo an MRI of his left shoulder due to his "continued and worsening symptoms." *Id.* at 305. An MRI of his left

shoulder on November 1, 2019, revealed delaminating articular sided tear of the supraspinatus tendon with moderate diffuse distal tendinosis; mild distal infraspinatus tendinosis; SLAP tear; moderate acromioclavicular degenerative joint disease with distal clavicular inferior spur formation; and at least mild intraarticular long head of biceps tendinosis with tenosynovitis inferior to the bicipital groove with trace sub-deltoid fluid. *Id.* at 319. On November 4, 2019, physician's notes indicate that an MRI of Hubbard's left shoulder showed a SLAP tear, tendinosis of the shoulder and biceps, and moderate degenerative joint disease. *Id.* at 306. It was noted a SLAP tear normally requires surgical intervention. *Id.* at 306. Plaintiff underwent a left carpal tunnel release procedure on January 9, 2020. *Id.* at 342.

Hubbard was also treated with for foot pain. *Id.* at 302. An examination revealed an antalgic gait, decreased left ankle range of motion, and calcaneal valgus with flattening of the arches. *Id.*

In June 2020, Hubbard was treated at University of Nebraska Medical Center for his left hip pain. Filing No. 23-9, Tr. at 648. He reported pain with movement and prolonged standing with associated numbness, swelling, instability, stiffness, and weakness. *Id.* An examination showed Hubbard had decreased range of motion of the left hip with pain, positive anterior impingement, butterfly, and log roll testing, pain with straight leg raise testing, and decreased sensation in the lateral femoral cutaneous nerve distribution, along the lateral foot, and first dorsal web-space. *Id.* at 650. He was diagnosed as having left hip pain status post left hip arthroscopy and lateral femoral cutaneous nerve neurapraxia. *Id.* The examining physician stated his "exam findings [were] concerning for residual impingement. His case is somewhat more complicated

because he got no relief with his previous surgery." *Id.* State agency medical consultants reviewed the evidence of record in 2019 and 2020 and did not find impairments of listing level severity. *Id.*, Filing No. 23-3 at 63–64, 66–68, 80, and 83–85.

Hubbard was being treated at the VA for depression and PTSD during the same period. He reported traumatic events while in the Navy—being injured on an aircraft carrier while deployed in Afghanistan and the death of a close friend by suicide. Filing No. 23-8, Tr. at 395. In November 2018, psychological testing showed that Hubbard was experiencing marked levels of anxiety, depression, cognitive dysfunction, and emotional lability. *Id.* at 430. A psychiatric evaluation noted Hubbard was very tense and dejected, reported poor memory and concentration, struggled with mood swings, was often edgy and irritable, was rather emotionally flat and colorless when interacting with others, and had a markedly pessimistic outlook for his future. *Id.* at 430-31. An examination showed that he was reserved; came off as irritable; and had an edgy, depressed, restricted affect. *Id.* at 431. Psychological test results showed Hubbard was experiencing marked levels of anxiety, depression, cognitive dysfunction, and emotional lability. *Id.* The treating physician noted that Hubbard was a poor candidate for a spinal cord stimulator, as his untreated mental impairments would impact the success of the trial. *Id.* at 432. He recommended that Hubbard begin mental health treatment. *Id.*

Hubbard was also treated for anxiety at the VA. *Id.* at 388. In 2019, Hubbard reported he was establishing care at the Omaha VA after receiving three years of treatment for his depression at the Lincoln VA. *Id.* at 388. His therapist noted that

Hubbard's score on psychological testing indicated "very severe symptoms of PTSD." *Id.* at 389. An examination demonstrated that Hubbard had a flat affect. *Id.* at 390. Hubbard was referred to a psychiatrist for his severe depression and PTSD. *Id.* at 390.

On March 12, 2019, Hubbard was seen by James Willcockson, Ph.D. *Id.* at 373. Hubbard stated that during the previous month, he had wished he were dead. *Id.* at 373. Dr. Willcockson noted that a screening was indicative of severe depression. *Id.* at 379. On June 1, 2020, Hubbard was treated via telephone for his PTSD. Filing No. 23-9, Tr. at 608. Hubbard reported that his symptoms had continued, and he was interested in pursuing treatment. *Id.* at 609. He further related that his time "as a stay-at-home parent has been the most stressful time of his life." *Id.* at 610. Progress notes indicated that Hubbard's PTSD symptoms "cause[d] clinically significant distress or impairment in social, occupational, or other important areas of functioning." *Id.* at 613

Consulting examiner Lee Branham, Ph.D., reviewed Hubbard's records and found mild limitations in Hubbard's ability to understand, remember, or apply information; moderate limitations in his ability to Interact with others; moderate limitations in his ability to concentrate, persist, or maintain pace; and mild limitations in his ability to Adapt or manage oneself. Filing No. 23-3 at 65, 81. After the Social Security Administration initially denied benefits, Hubbard sought reconsideration. Filing No. 23-4, Tr. at 161. The consultative psychologist, Dr. Kelly Tamayo, examined Hubbard and found Hubbard's PTSD and depression caused moderate limitations in Hubbard's ability to handle detailed instructions, sustain attention and concentration over time, and his ability to maintain an ordinary work week without symptom-related interruptions." Filing No. 23-3, Tr. at 86. Further she found "[h]is PTSD and depression

create moderate limitations in dealing with the public and supervisors" and "[h]is stress tolerance has been reduced to the point of moderate limitations in adapting to changes in the work environment." *Id.* She noted Hubbard has "limited ability to relate to coworkers, supervisor due to poor frustration tolerance, overwhelming anxiety and anger outbursts." *Id.* at 76.

C.   ALJ's Findings

The ALJ found Hubbard was not disabled. Filing No. 23-2, Tr. at 23. The ALJ undertook the standard five-step sequential process for analyzing and determining disability.[2] *Id.* at 11. She first found that Hubbard had not engaged in substantial gainful activity since his disability onset date of June 1, 2016. *Id.* at 12. The ALJ then found Hubbard had the following severe impairments including: left hip lateral femoral cutaneous nerve neurapraxia with radiculopathy, degenerative joint disease in his left shoulder, left carpal tunnel syndrome, status post release, obesity, depression, anxiety, and PTSD. *Id.* She concluded that Hubbard's impairments or combination of impairments did not meet or medically equal the severity of any listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526), so as to render Hubbard presumptively disabled. *Id.* at 13. She made that finding as to Hubbard's physical impairments (left hip lateral femoral cutaneous nerve neurapraxia with radiculopathy, degenerative joint disease in his left shoulder, left carpal tunnel syndrome), after considering listings 1.00 (musculoskeletal systems), 11.00

---

[2] The five steps are: (1) whether the claimant is engaged in any substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) whether the claimant can return to his or her past relevant work; and (5) whether the claimant can adjust to other work in the national economy. 20 C.F.R. §§ 404.1520(a)(5)(i)-(v); 416.920(a)(4)(i)-(v). The claimant has the burden of proof to show he or she is disabled through step four; at step five, the burden shifts to the Commissioner. *Snead v. Barnhart*, 360 F.3d 834, 836 (8th Cir.2004).

9

(neurological disorders), and 11.14 (peripheral neuropathy). *Id.* She found the record "does not evidence an extreme limitation in the claimant's ability to stand up from a seated position or balance while standing or walking[.]" *Id.* She based that conclusion on evidence that the claimant had been observed ambulating with a normal gait. *Id.*

With respect to Hubbard's mental impairments, the ALJ similarly found that the severity of the claimant's mental impairments, considered singly and in combination, did not meet or medically equal the criteria of listings for depressive, bipolar and related disorders (12.04), anxiety and obsessive-compulsive disorders (12.06), or (trauma and stressor-related disorders, including PTSD). *Id.* at 14–15.

The ALJ next determined that Hubbard had the residual functional capacity ("RFC") to perform light work as defined in 20 CFR 404.1567(b), with the following limitations:

> the claimant is able to climb ramps and stairs, balance, stoop, kneel, crouch, and crawl frequently. He is able to climb ladders occasionally. The claimant is able to use his left upper extremity to push and pull occasionally and to reach, handle, finger, and feel frequently. He can tolerate occasional exposure to extreme cold, vibration, and hazards such as high exposed places and moving mechanical parts. The claimant is able to perform simple and routine work tasks, to sustain concentration and persist at work tasks for two hours at a time with normal breaks in an eight-hour work day, and to perform work with few changes in routine. He is able to interact with coworkers, supervisors, and the public occasionally.

*Id.* at 15. The ALJ found the claimant's mental impairments, in combination, imposed some limitation in the functional area of understanding, remembering, or applying information. She discounted the severity of those limitations, however, based on mental status examinations that showed Hubbard had demonstrated intact memory, exhibited an average fund of knowledge, intact abstract reasoning, and at least average intelligence, and his thought process had been logical and goal-directed. *Id.* at 14.

10

Noting that Hubbard was able to drive, take his medications as prescribed, and independently complete his activities of daily living, she found Hubbard had moderate limitations in interacting with others; and in concentrating, persisting or maintaining pace; and in adapting or managing oneself.  *Id.* at 14–15.  She noted that Hubbard was able to care for his children independently and perform household chores.  She concluded that Hubbard had the mental RFC to "perform simple and routine work tasks, to sustain concentration and persist at work tasks for two hours at a time with normal breaks in an eight-hour workday, and to perform work with few changes in routine. He is able to interact with coworkers, supervisors, and the public occasionally."  *Id.* at 15.

She discounted Dr. Tamayo's conclusion that Hubbard's "PTSD and depression create[d] moderate limitations in dealing with the public and supervisors," noting that Hubbard had "presented as pleasant or cooperative at various healthcare encounters since his alleged onset date[,]" "was pleasant and did not appear acutely distressed," had been described as engaged and responsive, and was able "to go grocery shopping and to the gym, activities that involve some level of social interaction."  *Id.* at 14, 19.

On appeal, Hubbard argues that the ALJ erred in failing to discuss his low back and hip pain and failing to find Hubbard's impairments met the listing for spine disorders under 20 C.F.R. Part 404, Subpart P, Appendix 1 § 1.04.

## II.   DISCUSSION

### A.   Law

Review by this Court is limited to an inquiry into whether there is substantial evidence on the record to support the findings of the ALJ and whether the ALJ applied the correct legal standards.  *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011).

Substantial evidence means something less than a preponderance of the evidence, but more than a mere scintilla; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. However, this "review is more than a search of the record for evidence supporting the [ALJ or Commissioner's] findings," and "requires a scrutinizing analysis." *Scott ex rel. Scott v. Astrue*, 529 F.3d 818, 821 (8th Cir. 2008). In determining whether there is substantial evidence to support the Commissioner's decision, this court must consider evidence that detracts from the Commissioner's decision as well as evidence that supports it. *Finch v. Astrue,* 547 F.3d 933, 935 (8th Cir. 2008).

The Social Security Administration has promulgated a sequential process to determine whether a claimant qualifies for disability benefits. *See* 20 C.F.R. § 404.1520(a)(4). The determination involves a step-by-step analysis of the claimant's current work activity, the severity of the claimant's impairments, the claimant's residual functional capacity and his or her age, education and work experience. *Id.* At Step one, the claimant has the burden to establish that he or she has not engaged in substantial gainful activity since his or her alleged disability onset date. *Cuthrell v. Astrue*, 702 F.3d 1114, 1116 (8th Cir. 2013). At Step two, the claimant has the burden to prove he or she has a medically determinable physical or mental impairment or combination of impairments that significantly limits his or her physical or mental ability to perform basic work activities. *Id.* At Step three, if the claimant shows that his or her impairment meets or equals a presumptively disabling impairment listed in the regulations, he or she is automatically found disabled and is entitled to benefits. *Id.* Specifically, Listing

1.04A addresses spinal impairments.  In order to meet Listing 1.04, a claimant must meet the following criteria:

> 1. Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord with:  A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

20 C.F.R. Part 404, Subpart P, Appendix 1 § 1.04A.

If the claimant does not meet the listings, the ALJ determines the claimant's RFC, which the ALJ uses at Steps four and five.  20 C.F.R. § 404.1520(a)(4).  At Step four, the claimant has the burden to prove he or she lacks the RFC to perform his or her past relevant work.  *Cuthrell*, 702 F.3d at 1116.  If the claimant can still do his or her past relevant work, he or she will be found not disabled; otherwise, at Step five, the burden shifts to the Commissioner to prove, considering the claimant's RFC, age, education, and work experience, that there are other jobs in the national economy the claimant can perform.  *Id.; see Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010).

A claimant's RFC is what he or she can do despite the limitations caused by any mental or physical impairments.  *Toland v. Colvin*, 761 F.3d 931, 935 (8th Cir. 2014); 20 C.F.R. § 404.1545.  RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis, meaning 8 hours a day, for 5 days a week, or an equivalent work schedule.  SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996).  The Eighth Circuit often expresses "skepticism about the probative value of evidence of day-to-day activities," and finds it "necessary from time to time" to remind the Commissioner "'that to find a claimant has

the residual functional capacity to perform a certain type of work, the claimant must have the ability to perform the requisite acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" *Reed v. Barnhart*, 399 F.3d 917, 923-24 (8th Cir. 2005) (quoting Thomas v. Sullivan, 876 F.2d at 666, 669 (8th Cir. 1989)). "[T]the ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full-time competitive work." *Id.* at 923.

With respect to mental impairments, an ALJ cannot rely on the claimant's ability to perform limited functioning during a period of low stress as substantial evidence that a claimant who sometimes experiences high stress is not disabled. *Hutsell v. Massanari,* 259 F.3d 707, 713 (8th Cir. 2001). Given the unpredictable course of mental illness, "[s]ymptom-free intervals and brief remissions are generally of uncertain duration and marked by the impending possibility of relapse." *Andler v. Chater*, 100 F.3d 1389, 1393 (8th Cir. 1996). Moreover, "[i]ndividuals with chronic psychotic disorders commonly have their lives structured in such a way as to minimize stress and reduce their signs and symptoms." 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 12.00(E). "Such individuals may be much more impaired for work than their signs and symptoms would indicate." *Id.*

The RFC must (1) give appropriate consideration to all of a claimant's impairments; and (2) be based on competent medical evidence establishing the physical and mental activity that the claimant can perform in a work setting. *Mabry v. Colvin*, 815 F.3d 386, 390 (8th Cir. 2016). The ALJ is required to determine a claimant's RFC based on all relevant evidence, including medical records, observations

14

of treating physicians and others, and the claimant's own descriptions of his or her limitations.  *Papesh v. Colvin,* 815 F.3d 1126, 1131 (8th Cir. 2015).  "To properly determine a claimant's residual functional capacity, an ALJ is therefore 'required to consider at least some supporting evidence from a [medical] professional.'" *Hutsell,* 259 F.3d at 712 (quoting *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001)).

In instances where treating or examining source opinions are lacking, the ALJ cannot rely on his or her own inferences when weighing the available opinion evidence. See *Combs v. Berryhill,* 878 F.3d 642, 647-648 (8th Cir. 2017).  Although it is the ALJ's job to weigh the evidence, the ALJ may not substitute its opinion for that of a medical source.  *Id.*; *see also Everson v. Colvin,* No. CIV 12-4114, 2013 WL 5175916, at *20 (D.S.D. Sept. 13, 2013) (stating that "when there is no medical evidence in the record, the ALJ cannot simply make something up.").  An ALJ may discount or even disregard the opinion of a treating source where other medical assessments are supported by better or more thorough medical evidence, or where a treating source renders inconsistent opinions that undermine the credibility of such opinions.  *Reed*, 399 F.3d at 921.  The opinions of non-treating practitioners who have attempted to evaluate the claimant without examination do not normally constitute substantial evidence on the record as a whole upon which to base a denial of benefits.  See *Shontos v. Barnhart,* 328 F.3d 418, 425 (8th Cir. 2003).

A "social security hearing is a non-adversarial hearing, and the ALJ has a duty to fully develop the record."  *Smith v. Barnhart,* 435 F.3d 926, 930 (8th Cir. 2006).  The ALJ bears this responsibility "independent of the claimant's burden to press [his] case"

and it extends to cases where claimants are represented by counsel at the administrative hearing.  *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

To satisfy the burden to show the claimant is capable of performing other work, the ALJ is generally required to utilize testimony of a vocational expert if the claimant suffers from non-exertional impairments that limit his ability to perform the full range of work described in one of the specific categories set forth in the guidelines.  *Jones v. Astrue*, 619 F.3d 963, 972 (8th Cir. 2010).  In order for a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments.  20 C.F.R. §§ 404.1520(a)(4)(v); *see Taylor v. Chater*, 118 F.3d 1274, 1278 (8th Cir. 1997) (stating that a vocational expert's testimony may be considered substantial evidence "only when the testimony is based on a correctly phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies").  "When a hypothetical question does not encompass *all relevant impairments*, the vocational expert's testimony *does not constitute substantial evidence*."  *KKC ex rel. Stoner v. Colvin*, 818 F.3d 364, 377 (8th Cir. 2016) (quoting *Hunt v. Massanari*, 250 F.3d 622, 625 (8th Cir. 2001)) (emphasis added in *KKC*).

    B.    Analysis

The Court finds that Hubbard qualifies for benefits based on the Social Security Administration's sequential process, which supports a finding of disability.  Evidence of record supports the finding at Step 1 that Hubbard has not engaged in substantial gainful activity since his alleged onset date of October 31, 2013.  At Step 2, the combination of Hubbard's left hip lateral femoral cutaneous nerve neurapraxia with radiculopathy, degenerative joint disease in his left shoulder, left carpal tunnel syndrome, status post release, obesity, depression, anxiety, and posttraumatic stress

disorder ("PTSD") are medically determinable physical impairments which limit his ability to perform basic work activities. Hubbard's spinal condition, which the ALJ did not even address, may be of listing-level severity so as to render him presumptively disabled at Step 3.[3] However, the Court need not make that determination since the ALJ clearly erred in determining Hubbard's RFC at Step 4 and in posing an improper hypothetical to the vocational expert and Step 5 of the sequential evaluation.

The ALJ erred because when she determined Hubbard's RFC by relying on her own inferences rather than the medical evidence in the record. She further erred in failing to credit Hubbard's subjective complaints based on evidence of day-to-day activities that have little probative value with respect to whether Hubbard can meet the demands of full-time work. There is objective medical evidence in the record to support Hubbard's claims that he could not sit or stand for prolonged periods. His difficulty walking due to pain, spinal impairments, and hip instability is documented by numerous falls, as well as observations of an antalgic gait.

There is also evidence in the record that supports the notion that Hubbard had difficulty interacting with people due to his mental impairments. The ALJ erred in discounting the opinion of Dr. Tamayo, who was the only provider to examine Hubbard. The ALJ improperly credited the opinion of consulting physicians who relied exclusively

---

[3] Hubbard presented evidence that indicates his spine and hip impairments meet or equal the presumptively disabling condition of a disorder of the spine with nerve root compression under § 1.04. EMG notations show chronic left L3-5 radiculopathies. Those abnormal findings regarding Hubbard's radiculopathies indicate nerve root involvement. Further, Hubbard was found to have the severe impairment of left hip lateral femoral cutaneous nerve neurapraxia with radiculopathy. That also indicates nerve involvement. Hubbard was also noted to have tenderness in his lower extremities, limited ranges of motion, weakness, numbness and diminished sensation and positive straight leg raise testing. That evidence arguably necessitates a finding that he has impairments, either singly or in combination, that would meet or medically equal listing 1.04A. At the least, however, the ALJ should have considered whether Hubbard's spinal impairment was likely to have a significant impact on his ability to perform work-like functions.

on a review of medical records over that of Dr. Tamayo. Those consulting physicians' opinions do not provide substantial evidence to counter Dr. Tamayo's conflicting assessment. Further, the ALJ cited an illusory inconsistency to discount Dr. Tamayo's opinion that Hubbard had moderate limitations on his ability to maintain persistence and pace. An inability to handle detailed instructions and to sustain attention and concentration over time is not incompatible with average intelligence and an intact memory. The ALJ should have given controlling weight to Dr. Tamayo's opinion on the functional limitations of Hubbard's mental condition. Though Hubbard's depression, anxiety, and/or PTSD alone may not have directed a finding of disability, his considerable functional limitations should have been considered in combination with his physical impairments.

The ALJ's error in determining Hubbard's RFC consequently caused the ALJ to pose a hypothetical to the vocational expert that did not include all of Hubbard's functional limitations. Because the vocational expert testified that there would be no jobs in the national economy for a hypothetical individual with all of the limitations that are supported by the record, the Commissioner has not sustained her burden at Step 5 of the sequential evaluation. This Court finds that application of the five-step analysis results in a finding that Hubbard is disabled.

The clear weight of the evidence points to a conclusion that Hubbard has been disabled since his alleged onset date. Where further hearings would merely delay receipt of benefits, an order granting benefits is appropriate. See *Hutsell v. Massanari*, 259 F.3d at 709. Accordingly,

IT IS ORDERED that:

1. Plaintiff's Motion for a summary judgment reversing the determination of the Commissioner (Filing No. 29) is granted

2. Defendant's motion for a summary judgment affirming the determination of the Commissioner (Filing No. 30) is denied.

3. The final determination of the Commissioner is reversed.

4. This action is remanded to the Commissioner for an award of benefits.

Dated this 19h day of May, 2022.

BY THE COURT:

s/ Joseph F. Bataillon
Senior United States District Judge